**AFFIRM; Opinion Filed September 17, 2013.**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-13-00569-CV**

**IN THE INTEREST OF C.D., A CHILD**

**On Appeal from the 304th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JD-08-00440-W**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Evans
Opinion by Justice Myers

A.D. appeals the trial court's judgment terminating his parental rights to his child, C.D. Appellant brings one issue on appeal contending the evidence is factually insufficient to support the jury's finding that termination was in the best interest of the child. We affirm the trial court's judgment.

## BACKGROUND

Appellant met N.D. in a program helping persons leaving jail. Appellant had been jailed for a drug offense. Appellant and N.D. married, and their child, C.D., was born in 2002. In 2004, N.D. began doing drugs and drinking, and appellant left with C.D. When appellant lost his job due to missing work caring for C.D., he turned to selling drugs to make money.

In 2008, appellant was stopped for a traffic violation while C.D. was in the car. The police officers found cocaine in the car and arrested appellant in front of C.D. C.D. was placed

in foster care. Appellant was indicted for possession with intent to deliver four grams or more of cocaine, and he was placed on deferred adjudication community supervision for five years.[1]

Dallas County Child Protective Services Unit of the Texas Department of Family and Protective Services (CPS) required appellant and N.D. to complete services in order to regain custody of C.D. When appellant and N.D. failed to complete the services, CPS brought suit to terminate appellant's and N.D.'s parental rights. On the eve of trial, a relative was found who was willing to take custody of C.D., and the termination case did not proceed. C.D.'s third cousin, Cristal Joslin, and her friend, Roger Weems, became the managing conservators for C.D. with appellant and N.D. being possessory conservators.

While on community supervision, appellant continued to sell drugs. Appellant was charged with two counts of delivery of cocaine committed in 2009, retaliation committed in 2009, and possession of cocaine with intent to deliver committed in May 2011. In October 2011, appellant pleaded guilty to these offenses, and his guilt was adjudicated in the 2008 case. Appellant was sentenced to ten years' imprisonment in the four drug cases and five years' imprisonment in the retaliation case. Appellant's expected release date is in 2015, but his release could be as late as 2021.

In 2009, while in Joslin and Weems's care, C.D. was diagnosed with Type 1 juvenile diabetes. This medical condition requires close monitoring of C.D.'s diet, blood-sugar levels, and ketone levels and regular insulin injections. While in Joslin's care, C.D.'s diabetes was not under control. C.D. also was admitted to mental hospitals a few times. Later, Joslin and Weems separated, and C.D. was left in Joslin's sole care. Joslin was not able to care for C.D. adequately on her own while working to support herself and C.D. In early 2012, Joslin told CPS she could

---

[1] It is not clear from the evidence whether appellant's indictment, deferred adjudication, and subsequent conviction for possession with intent to deliver arose from the incident when C.D. was in the car or from another incident in 2008.

no longer care for C.D. Joslin dropped off C.D. and her belongings at CPS, which placed C.D. in foster care. CPS then filed suit to terminate appellant's and N.D.'s parental rights. While in foster care, C.D.'s blood sugar and ketone levels were better controlled, and her emotional stability improved. C.D. has not been in any mental hospitals since being placed in foster care.

At trial, numerous witnesses, including C.D.'s endocrinologist, testified that stability was important for C.D. to manage her diabetes, and the best stability would come from a permanent family through adoption instead of foster care. A video recording of C.D. was played for the jury in which C.D. stated she wanted to be adopted but still wanted to have contact with her biological parents and her maternal grandmother. CPS caseworkers testified that two families were interested in adopting C.D. C.D. had previously lived with one of the families and liked them. C.D.'s current foster family does not intend to adopt her but is committed to caring for C.D. until she is adopted or reaches adulthood. CPS cannot guarantee that C.D. would remain with that foster family if she is not able to be adopted.

## BEST INTEREST OF THE CHILD

In his sole issue on appeal, appellant contends the evidence was factually insufficient to support the jury's finding that termination of appellant's parental rights was in C.D.'s best interest.

The involuntary termination of parental rights implicates fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re T.A.D.*, 397 S.W.3d 835, 838 (Tex. App.—Dallas 2013, no pet.). To terminate parental rights, the trier of fact must find, by clear and convincing evidence, that the parent has committed one of the acts prohibited under section 161.001(1) of the Texas Family Code and that termination of parental rights is in the child's best interest. TEX. FAM. CODE ANN. § 161.001(1), (2) (West Supp. 2012); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). Clear and convincing evidence is "proof that will produce in the mind of

the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." FAM. § 101.007 (West 2008).

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all of the evidence. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). But we give due deference to the fact finder's resolution of factual questions. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We then determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d at 345; *In re J.F.C.*, 96 S.W.3d at 266.

Before terminating a parent's rights, the fact finder must find, in addition to one of the statutory grounds, that terminating the parent's rights is in the child's best interest. *See* FAM. § 161.001(2). In determining whether terminating the parent-child relationship is in a child's best interest, we must consider the following factors:

1. the child's desires;

2. the child's present and future emotional and physical needs;

3. the present and future emotional and physical danger to the child;

4. the parenting abilities of the persons seeking custody;

5. the programs available to the persons seeking custody to help promote the best interest of the child;

6. the plans for the child by those persons seeking custody;

7. the stability of the home or proposed placement;

8. the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

9. any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976).

## The Child's Desires

Stacy Grant, a child protective safety specialist with CPS, and Melissa Tyra, a CASA[2] volunteer, both testified C.D. told them she wanted to be adopted. A video recording was played for the jury in which C.D. stated she wanted to be adopted. C.D. also stated she wanted to be able to have continued contact with her mother and grandmother as well as appellant. Grant testified that an open adoption allowing C.D. continued contact with her biological family was possible.

## The Child's Present and Future Emotional and Physical Needs

The testimony showed C.D.'s diabetes and emotional issues require structure and stability that could be best provided by her being a permanent part of a caring family. C.D.'s diabetes requires careful monitoring of her diet, blood sugar and ketone levels, and insulin injections that can best be fulfilled with a permanent and supportive family providing the structure for C.D. to have medical discipline. C.D.'s diabetes care will continue for the rest of her life. C.D. also needs a stable family environment to help her deal with her behavioral issues.

While in Joslin's care, C.D. was diagnosed with hyperactive disorder, adjustment disorder, and disruptive behavior disorder and was prescribed different psychiatric drugs. C.D. was also admitted to mental hospitals on multiple occasions. C.D.'s current foster family has provided her with good stability and support, both for her diabetes and her emotional and behavioral issues. Since being placed with her current foster family, C.D. has not been placed in a mental hospital, she is being "titrated off" the psychiatric drugs, and her diabetes is under control.

---

[2] "CASA" stands for Court Appointed Special Advocates. They are appointed for abused and neglected children in foster care.

**The Present and Future Emotional and Physical Danger to the Child**

If C.D.'s diabetes is not controlled, complications from diabetes could result in blindness, kidney failure, amputations, stroke, cardiovascular problems, and death. The jury could also conclude from the evidence that if C.D. were not in a stable environment, her emotional status could be jeopardized. C.D.'s doctor testified that diabetic children lacking a family structure with proper family support "will likely fail" to control their diabetes.

**The Parenting Abilities of the Persons Seeking Custody**

Appellant is not seeking immediate custody because he is in prison until at least 2015, and possibly until 2021. Father testified that he would like for C.D. to remain in foster care until he is released from prison and can take custody of her. He testified that he has done no study of the care required for a diabetic but stated he is willing to learn. He acknowledged that his wrong decisions were the reason she was in foster care. Appellant testified he has changed while in prison and has turned his life to God.

Grant testified that two families were interested in adopting C.D. but that CPS has not yet selected a family. There was no evidence of the parenting abilities of these families.

**The Programs Available to the Persons Seeking Custody
to Help Promote the Best Interest of the Child**

Crystal Bartlett, a CASA supervisor, testified that for families adopting a child from CPS, CPS offers "counseling, family therapy, provide[s] all sorts of resources to them with whatever crisis situation that's going on." There are also post-adoption services, including monetary subsidies to help the family provide for the child, free health insurance, and tuition waived at any state university. Children's Medical Center in Dallas provides a diabetes education program to help families learn how to care for a diabetic child.

### The Plans for the Child by Those Persons Seeking Custody

Appellant testified his plan was for C.D. to remain in foster care until he was released from prison. Then, he plans to work with CPS to eventually regain custody of C.D. At the time of trial, C.D. was ten years old. She will be thirteen in 2015 when appellant reaches his expected release date, and eighteen when he completes the full ten-year sentence.

Grant testified that CPS plans to have C.D. adopted in an open adoption whereby she can maintain contact with her biological parents and grandmother. Grant testified that CPS is in favor of open adoption in this case because that is what C.D. wants.

### The Stability of the Home or Proposed Placement

Appellant, being in prison, has no home. His desire is for C.D. to remain in her current foster home, which is providing stability and good care for her, until he is released and can take custody of her. Grant testified that the foster mother has stated she is willing to care for C.D. as long as is necessary, but CPS cannot guarantee that C.D. will remain with that foster family. Appellant testified he thought he could get a job and an apartment after his release despite his felony record, however, he did not explain what kind of work he could do. Appellant also testified he did not own a car and would have to rely on public transportation or make other arrangements to get C.D. to her medical appointments.

Grant testified that CPS planned to place C.D. with an adoptive family that could provide her the care, support, and stability she needs.

### The Acts or Omissions of the Parent Which May Indicate That the Existing Parent-Child Relationship Is Not a Proper One

Appellant testified to his multiple felony drug convictions. Appellant admitted he pleaded guilty to retaliation as part of plea deal, but he denied committing the offense. While on community supervision, appellant continued to commit felonies. Appellant testified that he now realized he placed C.D. in danger by having drugs in the car while driving with her in the car, but

he did not recognize that as dangerous at the time. Due to his incarceration, appellant cannot provide any care for C.D. Appellant admitted he does not know how to care for a child with diabetes.

### Excuses for the Acts or Omissions of the Parent

Appellant testified he began selling drugs after he lost his job due to missing work caring for C.D. Appellant said he turned to selling drugs because "at the time, I thought it was the easiest, fastest way for me to make money and just get my daughter what she wants." Appellant stated that at the time, he thought he was protecting C.D. by making money selling drugs. However, he also testified he now knows that keeping his daughter happy was no excuse for selling drugs.

### Factual Sufficiency of the Evidence That Termination Is in C.D.'s Best Interest

The testimony at trial shows appellant will be incarcerated until at least 2015 and possibly until 2021. Appellant's voluntary actions of selling drugs resulted in his incarceration and C.D.'s being placed in foster care.

C.D. suffers from diabetes and behavioral issues. C.D. requires a supportive, stable family structure to keep control of her diabetes and her behavioral issues. If she fails to keep control of her diabetes, the result could be catastrophic health problems, including blindness, amputations, stroke, kidney failure, and even death. There is no family member available who can provide C.D. the structure and stability she requires. The evidence shows that an appropriate adoptive family can best provide C.D. the structure and stability she requires. Grant testified that CPS cannot seek an adoptive family until the parents' rights have been terminated.

C.D. told the jury in a video exhibit that she wanted to be adopted yet still maintain contact with her biological parents and grandmother. Grant testified that CPS would try to find an adoptive family for C.D. that would agree to an open adoption.

Appellant testified he loved C.D. and wanted to regain custody of her when he is released. However, when C.D. was first placed in foster care by CPS, he was assigned services to complete in order to regain custody of C.D. and he failed to complete them. Although appellant showed good parenting decisions by getting C.D. away from N.D. when N.D.'s drinking and drug use posed a danger to C.D., appellant's decision to sell drugs resulted in his losing custody of her and her being placed in foster care. Appellant testified he has turned his life over to God and now knows that selling drugs was wrong. However, he does not know how to care for a child with diabetes. He testified he thought he could get a job despite his criminal record, but he did not explain how he could properly care for C.D. with her diabetes and behavioral issues as a single parent while keeping his job. Appellant was unable to keep his last legal job while caring for C.D., and she did not then have diabetes.

After considering and weighing all the evidence while giving due deference to the jury's resolution of factual questions, we conclude that a juror could reasonably form a firm belief or conviction that termination of appellant's parental rights was in C.D.'s best interest. Accordingly, we conclude the evidence was factually sufficient to support the jury's finding that termination of appellant's parental rights was in C.D.'s best interest. We overrule appellant's sole issue.

## CONCLUSION

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

130569F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

In the Interest of C.D., a Child

No. 05-13-00569-CV

On Appeal from the 304th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JD-08-00440-W.
Opinion delivered by Justice Myers.
Justices Lang and Evans participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 17th day of September, 2013.

/Lana Myers/
LANA MYERS
JUSTICE